**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **CGBM 100, LLC** | § | |
| **and ACCUTRANS, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | **C. A. NO.: _____** |
| **v.** | § | |
| | § | **DIVERSITY** |
| **FLOWSERVE US INC.,** | § | |
| **FLOWSERVE CORPORATION,** | § | **JURY DEMANDED** |
| **and STERLING SHIPYARD, LP,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, CGBM 100, LLC ("CGBM") and Accutrans, Inc. (hereinafter sometimes collectively "Plaintiffs" or "CGBM/Accutrans") filing their Original Complaint against Defendants Flowserve US Inc. and Flowserve Corporation (collectively "Flowserve") and Sterling Shipyard, LP ("Sterling"), and would respectfully show the Court as follows:

### I.

### PARTIES

1. This is an action for breach of contract, breach of express and implied warranties, fraud, negligent misrepresentation, and other relief to be sought at trial arising out of the failure of Defendants to perform, manufacture, assemble, construct, and deliver two double-hull tank barges and component parts with specifications to transfer coker feed cargo at a rate of approximately 5,000 barrels per hour.

[1]

2.      CGBM 100, LLC, is a limited liability company organized and existing under the laws of the State of Louisiana, and has its principal place of business in Kenner, Jefferson Parish, Louisiana. Its sole member is a citizen of Louisiana.

3.      Accutrans, Inc., is a corporation organized and existing under the laws of the State of Louisiana, and has its principal place of business in Kenner, Jefferson Parish, Louisiana.

4.      Defendant Flowserve Corporation is a corporation that is organized and exists under the laws of the State of New York.  Defendant at all times material to this action has continuously and systematically engaged in business in the State of Texas by selling, distributing, and servicing its goods and services therein and by registration with the Texas Secretary of State to do business therein.  Defendant maintains its principal and regular place of business in Dallas County, Texas, at 5215 N. O'Connor Blvd., Suite 2300, Irving, Texas 75039, and maintains a designated agent on whom service of citation may be made in this cause. The causes of action asserted herein arose from or are connected with the purposeful acts committed by Defendant in Texas. Accordingly, Defendant may be cited by serving its registered agent for service of process, C.T. Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201-4240.

5.      Defendant Flowserve US Inc. is a corporation that is organized and exists under the laws of the State of Delaware.  Defendant at all times material to this action has continuously and systematically engaged in business in the State of Texas by selling, distributing, and servicing its goods and services therein and by registration with the Texas Secretary of State to do business therein.  Defendant maintains its principal and regular place of business in Dallas County, Texas, at 5215 N. O'Connor Blvd., Suite 2300, Irving, Texas 75039, and maintains a designated agent on whom service of citation may be made in this cause. The causes of action asserted herein arose from or are connected with the purposeful acts committed by Defendant in

[2]

Texas. Accordingly, Defendant may be cited by serving its registered agent for service of process, C.T. Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201-4240.

6.      Defendant Sterling Shipyard, LP, is a limited partnership that is organized and exists under the laws of the State of Texas.  Defendant maintains its principal and regular place of business in Jefferson County, Texas, at 906 Main Street, Port Neches, Texas, 77651. Defendant may be cited by serving its registered agent for service of process, Milton B. Taylor, 2403 Black Oak, Orange, Texas, 77632.

## II.

### JURISDICTION AND VENUE

7.      The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1), because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

8.      Venue is proper in the Galveston Division of the Southern District of Texas under 28 U.S.C. §1391(b)(2)&(3).  Section 13.6 of the August 1, 2012, Barge Construction Contract between CGBM and Sterling at issue herein ("the Sterling Contract") provides that "venue for any action brought hereunder shall be proper in the United States District Court for the Southern District of Texas, Galveston Division."  The terms, specifications, conditions, representations, warranties, and remedies included within the Sterling Contract are a substantial part of the events and omissions giving rise to this claim.  Accordingly, the exclusive venue for CGBM/Accutrans' claims is in the United States District Court for the Southern District of Texas, Galveston Division.  *See* Exhibit 1, August 1, 2012, Barge Construction Contract, §13.6. (Filed Under Seal).

[3]

## III.

### CONDITIONS PRECEDENT

9.     All conditions precedent to the filing and maintaining of this civil action and the claims asserted herein have occurred, have been met or have been waived by Defendants.

## IV.

### OPERATIVE FACTS

10.     CITGO Refining and Chemicals, LP, (hereinafter "CITGO") and CGBM entered into a Transportation Services Agreement on or about June 11, 2012 (hereinafter "Transportation Agreement").   The Transportation Agreement required CGBM to construct two barges on or before a specified date and, once in operation, to transport coker feed/VTB (hereinafter "cargo") from CITGO's Corpus Christi refinery, east plant at dock number 7, to Corpus Christi refinery west plant at dock number 6, a distance of 4.1 miles by barge, at a rate of 46,000 barrels per day for a period of five years.

11.     The Transportation Agreement required CGBM to hire a third party to design, build and construct two barges.  The barges were to be constructed with a hot oil cargo heating system and self-discharging screw pump transfer system that was redundant.  Each barge would have two pumps.  Each pump was to be capable of discharging the required quantity of cargo independently of the other pump.  The cargo was to be used by CITGO to operate its refinery and, thus, the contract required redundancy in the screw pump transfer system because of the catastrophic harm that would occur if the Corpus Christi refinery were to shut down due to the failure to deliver 46,000 barrels of cargo by CGBM each day.

12.     CGBM contracted to be the sole transporter of cargo to the CITGO refinery for a period of 5 years.  CGBM was also required to hire a third party to construct a tow boat to move

[4]

the barges in compliance with the Transportation Agreement.

13.     To comply with its obligations under the Transportation Agreement, CGBM entered into the Sterling Contract on August 1, 2012. Under the terms of the Sterling Contract, Sterling was to construct two double-skinned, steel tank barges for CGBM that would be suitable for transportation of cargo to meet CITGO's requirements under the Transportation Agreement. CGBM paid Sterling $14,150,000 to build the two barges under the Sterling Contract.

14.     In particular, Sterling was to construct, equip, outfit, test and complete both barges and make them ready for operation.  This included installation of the screw pumps and cargo transfer systems on each barge.  Flowserve, a subcontractor of Sterling approved by CGBM/Accutrans, designed and manufactured the screw pumps and the cargo transfer system.

15.     Flowserve issued a sales proposal dated September 19, 2012, to supply four screw pumps suitable for the barges that would achieve a flow rate of 4,930 barrels per hour to 5,010 barrels per hour for a cost of $1,329,766.  This included the cost of engineering a design to modify Flowserve's existing NL pump design and to shop test the pumps for performance and vibrations.  This proposal was accepted by CGBM/Accutrans on September 19, 2012.  Flowserve then redesigned its existing NL pumps and the entire cargo transfer system.  Sterling subsequently installed the Flowserve screw pumps and cargo transfer systems pursuant to the instructions and specifications of Flowserve.

15.     The two barges, Cycler 3000 and Cycler 5500, were completed on or about February 19, 2014, but were never formally accepted as called for in the Sterling Contract due to a change order dispute between CGBM and Sterling.  Before resolving the change order dispute, CGBM discovered the barge cargo pumps and transfer systems did not function properly, did not meet contractual specifications, and/or were otherwise deficient. This included, but was not limited to, each barge's inability to pump cargo without excessive vibration and inability to work as designed to reach the needed flow rate of approximately 5,000 barrels per hour (3,500 gallons

[5]

per minute).

16.    CGBM/Accutrans gave verbal notice to Sterling and Flowserve and provided them with the opportunity to fix, repair, or rework the barges' cargo transfer systems on February 25, 2014. Written Notice was given on March 19, 2014.   However, despite efforts from February 25, 2014, to April 10, 2014, neither Sterling nor Flowserve could determine (i) why the barges' pumps and cargo transfer systems did not work or (ii) how to fix them. Accordingly, Cycler 3000 and Cycler 5500 continued to perform below the contractually-agreed specifications.   Defendants abandoned all efforts to fix, repair or rework the cargo transfer systems on April 11, 2014, and have been in default since that date.

17.    The above-referenced deficiencies of the barges' cargo transfer systems forced CGBM/Accutrans to incur out of pocket costs that continue to accrue, but are estimated at the time of this filing to be approximately $3,400,000.  Faced with the ultimate responsibility for supplying cargo to operate CITGO's refinery under the Transportation Agreement, CGBM/Accutrans took those actions necessary to avoid a breach of the Transportation Agreement and to mitigate the attendant risk of a refinery shut down.  These efforts included (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) purchasing and modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems, which obligation has been disclaimed wrongly by Defendants and which effort is ongoing by CGBM/Accutrans.

[6]

**V.**

### CAUSES OF ACTION

**A.     Count I—Breach of Contract by Sterling and Flowserve**

18.     CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-17 as if fully set forth herein.

19.     As noted above, under the Sterling Contract, Sterling was required to deliver two tank barges with specifications to transfer coker feed cargo at a rate of approximately 5,000 barrels per hour as required under the Transportation Agreement.  CGBM/Accutrans performed their contractual obligations under the Sterling Contract in all respects.  However, Sterling failed to tender barges conforming in all respects to the Sterling Contract.   As a result, CGBM/Accutrans are entitled to recover actual damages, prejudgment interest, and costs. Moreover, because of Sterling's breach of its contractual obligations, CGBM/Accutrans have sustained significant losses, which were the natural and foreseeable consequences of Sterling's breach, including, but not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) purchasing and modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.  As a result, CGBM/Accutrans are entitled to incidental, consequential, and special damages.

20.     CGBM/Accutrans presented their claim to Sterling/Flowserve on several occasions, including on March 18, 2014, and April 11, 2014.  More than thirty days have elapsed since a demand was made, and Sterling has failed and refused to make payment to CGBM/Accutrans.

21.     Under its September 19, 2012, sales proposal, Flowserve agreed to design,

[7]

engineer, test, and supply four screw pumps and cargo transfer systems suitable for the Sterling-built barges that would achieve a flow rate of 4,930 barrels per hour to 5,010 barrels per hour. CGBM/Accutrans performed their contractual obligations under the September 19, 2012, sales proposal in all respects. However, Flowserve failed to tender goods conforming in all respects to the September 19, 2012, sales proposal. As a result, CGBM/Accutrans are entitled to recover actual damages, prejudgment interest, and costs. Moreover, because of Flowserve's breach of its contractual obligations, CGBM/Accutrans have sustained significant losses, which were the natural and foreseeable consequences of Flowserve's breach, including, but not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems. As a result, CGBM/Accutrans are entitled to incidental, consequential, and special damages.

22.     CGBM/Accutrans presented their claim to Flowserve on several occasions, including on March 19, 2014, and April 11, 2014. More than thirty days have elapsed since a demand was made, and Flowserve has failed and refused to make payment to CGBM/Accutrans.

### B.     Count II-- Breach of Express Warranties by Sterling and Flowserve

23.     CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-22 as if fully set forth herein.

24.     During the course of negotiations leading to the Sterling Contract, Sterling agreed, orally and in writing, that it would sell and deliver two double-skinned, steel tank barges to CGBM that would be suitable for transportation of cargo to meet CITGO's requirements under the Transportation Agreement by being capable of transferring coker feed cargo at a rate of approximately 5,000 barrels per hour. Such representations and warranties were made to

[8]

CGBM and its affiliates with the intent to induce CGBM/Accutrans to enter into the Sterling Contract, and such representations and warranties were in fact relied upon by CGBM/Accutrans in purchasing the two tank barges from Sterling.

25.     Sterling also made representations to CGBM and its affiliates in the period after the Sterling Contract was entered into that the Cycler 3000 and Cycler 5500 could be modified to perform as warranted to meet contractual specifications, but blamed Flowserve for its failure to supply pumps that met the contract specifications.  However, despite efforts from February 25, 2014, to April 10, 2014, Sterling could not determine (i) why the barges' cargo transfer systems did not work or (ii) how to fix them.  Instead, Sterling abandoned all efforts to fix, repair or rework the cargo transfer systems on April 11, 2014.

26.     As a result of the failure of the Cycler 3000 and Cycler 5500 to perform as warranted, CGBM/Accutrans have sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue.  These damages include, but are not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.

27.     The representations referenced above were made directly to CGBM/Accutrans and/or its affiliates, and CGBM/Accutrans are therefore in privity with Sterling so as to assert express warranty claims against Sterling under TEX. BUS. & COM. CODE § 2.313.

28.     In addition or in the alternative, CGBM/Accutrans are entitled to assert express warranty claims against Sterling even in the absence of privity under TEX. BUS. & COM. CODE §§ 2.313 and 2.318.

[9]

29.     In addition, should Sterling seek to interpose any limitation of remedies as between itself and CGBM/Accutrans, such limitations are precluded, because such limited remedies, if any, failed of their essential purpose, and/or are unconscionable under TEX. BUS. & COM. CODE §§ 2.719(b) and 2.719(c).

30.     During the course of negotiations leading to Accutrans' acceptance of Flowserve's September 19, 2012, sales proposal, Flowserve agreed, orally and in writing, that it would sell and deliver four screw pumps suitable for the Cycler 3000 and Cycler 5500 that would achieve a flow rate of 4,930 barrels per hour to 5,010 barrels per hour to meet CITGO's requirements under the Transportation Agreement.  Such representations and warranties were made to Accutrans and its affiliates with the intent to induce CGBM/Accutrans to accept Flowserve's September 19, 2012, sales proposal, and such representations and warranties were in fact relied upon by CGBM/Accutrans in purchasing the four pumps and cargo transfer system from Flowserve.

31.     Flowserve also made representations to CGBM and its affiliates in the period after the September 19, 2012, sales proposal that the defective pumps and cargo transfer systems integrated into the Cycler 3000 and Cycler 5500 could be modified to perform as warranted to meet contractual specifications.  However, despite efforts from February 25, 2014, to April 10, 2014, Flowserve could not determine (i) why the barges' pumps and cargo transfer systems did not work or (ii) how to fix them.  Instead, Flowserve abandoned all efforts to fix, repair or rework the pumps and cargo transfer systems on April 11, 2014.

32.     As a result of the failure of the pumps and cargo transfer systems integrated into the Cycler 3000 and Cycler 5500 to perform as warranted, CGBM/Accutrans has sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue. These damages include, but are not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the

[10]

Transportation Agreement, (ii) purchasing and modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.

33.    The representations referenced above were made directly to Accutrans and/or its affiliates, and CGBM/Accutrans are therefore in privity with Flowserve so as to assert express warranty claims against Flowserve under TEX. BUS. & COM. CODE § 2.313.

34.    In addition or in the alternative, CGBM/Accutrans are entitled to assert express warranty claims against Flowserve even in the absence of privity under TEX. BUS. & COM. CODE §§ 2.313 and 2.318.

35.    In addition, should Flowserve seek to interpose any limitation of remedies as between itself and CGBM/Accutrans, such limitations are precluded, because such limited remedies, if any, failed of their essential purpose, and/or are unconscionable under TEX. BUS. & COM. CODE §§ 2.719(b) and 2.719(c).   Additionally, such limitation of remedies, if any, is precluded due to material misrepresentations and fraud by Flowserve under TEX. BUS. & COM. CODE § 2.721.

C.    ***Count III--Breach of Implied Warranty of Merchantability by Sterling and Flowserve***

36.    CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-35 as if fully set forth herein.

37.    At all material times, Sterling held itself out as having knowledge and skill peculiar to the design, fabrication, maintenance and repair of all types of vessels, including the double-hull tank barges at issue herein.  Accordingly, as a merchant under TEX. BUS. & COM. CODE § 2.314, Sterling impliedly warranted that the Cycler 3000 and Cycler 5500 would be

merchantable and reasonably fit for the ordinary purpose for which the barges were to be used. However, the Cycler 3000 and Cycler 5500 were not as warranted and were defective in their ability to transfer cargo such that they were not fit for the purpose for which they were to be used.

38.     CGBM/Accutrans timely notified Sterling of the defects in the Cycler 3000 and Cycler 5500 and the resultant breach of the warranty of merchantability.

39.     As a result of the failure of the Cycler 3000 and Cycler 5500 to perform as warranted, CGBM/Accutrans have sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue.  These damages include, but are not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) purchasing modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.

40.     CGBM, as buyer of the Cycler 3000 and Cycler 5500, was at all relevant times in privity with Sterling so as to assert implied warranty claims against Sterling under TEX. BUS. & COM. CODE § 2.314.

41.     In addition or in the alternative, CGBM/Accutrans are entitled to assert implied warranty claims against Sterling even in the absence of privity under TEX. BUS. & COM. CODE §§ 2.314 and 2.318.

42.     In addition, should Sterling seek to interpose any limitation of remedies as between itself and CGBM/Accutrans, such limitations are precluded, because such limited remedies, if any, failed of their essential purpose, and/or are unconscionable under TEX. BUS. & COM. CODE §§ 2.719(b) and 2.719(c).

[12]

43.     At all material times, Flowserve held itself out as a world leader in highly engineered pumps and as having knowledge and skill peculiar to the design, engineering, maintenance and repair of heavy-duty, high-horsepower pumps for every conceivable hydrocarbon processing application, including the four screw pumps and cargo transfer systems for coker feed cargo incorporated into the double-hull tank barges at issue herein.  Accordingly, as a merchant under TEX. BUS. & COM. CODE § 2.314, Flowserve impliedly warranted that the four screw pumps and cargo transfer systems would be merchantable and reasonably fit for the ordinary purpose for which they were to be used.  However, the four screw pumps and cargo transfer systems were not as warranted and were defective in their ability to transfer cargo such that they were not fit for the purpose for which they were to be used.

44.     CGBM/Accutrans timely notified Flowserve of the defects in the four screw pumps and cargo transfer systems and the resultant breach of the warranty of merchantability.

45.     As a result of the failure of the Cycler 3000 and Cycler 5500 to perform as warranted, CGBM/Accutrans has sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue.  These damages include, but are not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.

46.     Accutrans, as buyer of the four screw pumps and cargo transfer systems was at all relevant times in privity with Flowserve so as to assert implied warranty claims against Flowserve under TEX. BUS. & COM. CODE § 2.314.

47.     In addition or in the alternative, CGBM/Accutrans are entitled to assert implied warranty claims against Flowserve even in the absence of privity under TEX. BUS. & COM. CODE

[13]

§§ 2.314 and 2.318.

48.     In addition, should Flowserve seek to interpose any limitation of remedies as between itself and CGBM/Accutrans, such limitations are precluded, because such limited remedies, if any, failed of their essential purpose, and/or are unconscionable under TEX. BUS. & COM. CODE §§ 2.719(b) and 2.719(c).   Additionally, such limitation of remedies, if any, is precluded due to material misrepresentations and fraud by Flowserve under TEX. BUS. & COM. CODE § 2.721.

### D.     *Count IV--Breach of Implied Warranty of Fitness for a Particular Purpose by Sterling and Flowserve*

49.     CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-48 as if fully set forth herein.

50.     Sterling is in the business of designing, fabricating, maintaining, and repairing all types of vessels, including double-hull tank barges.  In this regard, Sterling holds itself out as being able to reliably meet all of a customer's marine needs.

51.     Prior to the time the parties' entered into the Sterling Contract, Sterling knew by way of information exchanged during contract negotiations (i) that CGBM was buying the Cycler 3000 and Cycler 5500 for transportation of cargo to meet CITGO's requirements under the Transportation Agreement by being capable of transferring coker feed cargo at a rate of approximately 5,000 barrels per hour, and (ii) that CGBM was relying on Sterling's skill and judgment to design, fabricate, and furnish double-hull tank barges that would be suitable and conform to those identified specifications.

52.     The Cycler 3000 and Cycler 5500 were not fit for transportation of cargo to meet CITGO's requirements under the Transportation Agreement, because they were not capable of transferring coker feed cargo at a rate of approximately 5,000 barrels per hour.

[14]

53.     CGBM/Accutrans timely notified Sterling of the defects in the Cycler 3000 and Cycler 5500 and the resultant breach of the warranty of fitness for a particular purpose.

54.     As a result of the failure of the Cycler 3000 and Cycler 5500 to perform as warranted, CGBM/Accutrans has sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue.  These damages include, but are not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.

55.     CGBM, as buyer of the Cycler 3000 and Cycler 5500 was at all relevant times in privity with Sterling so as to assert implied warranty claims against Sterling under TEX. BUS. & COM. CODE § 2.314.

56.     In addition or in the alternative, CGBM/Accutrans are entitled to assert implied warranty claims against Sterling even in the absence of privity under TEX. BUS. & COM. CODE §§ 2.314 and 2.318.

57.     In addition, should Sterling seek to interpose any limitation of remedies as between itself and CGBM/Accutrans, such limitations are precluded, because such limited remedies, if any, failed of their essential purpose, and/or are unconscionable under TEX. BUS. & COM. CODE §§ 2.719(b) and 2.719(c).

58.     Flowserve is in the business of designing, engineering, maintaining, and repairing heavy-duty, high-horsepower pumps for every conceivable hydrocarbon processing application. In this regard, Flowserve holds itself out as one of the world's leading providers of pumps and services for the global infrastructure and processing industries.

[15]

59.     Prior to Accutrans' acceptance of Flowserve's September 19, 2012, sales proposal, Flowserve knew by way of information exchanged during contract negotiations (i) that Accutrans was buying the four screw pumps and cargo transfer systems for the Cycler 3000 and Cycler 5500 to meet CITGO's requirements under the Transportation Agreement by being capable of transferring coker feed cargo at a rate of approximately 5,000 barrels per hour, and (ii) that Accutrans was relying on Flowserve's skill and judgment to design, engineer, and furnish screw pumps and cargo transfer systems that would be suitable and conform to those identified specifications.

60.     The four Flowserve screw pumps and cargo transfer systems integrated into the Cycler 3000 and Cycler 5500 were not fit for transportation of cargo to meet CITGO's requirements under the Transportation Agreement, because they were not capable of transferring coker feed cargo at a rate of approximately 5,000 barrels per hour.

61.     CGBM/Accutrans timely notified Flowserve of the defects in the four Flowserve screw pumps and cargo transfer systems integrated into the Cycler 3000 and Cycler 5500 and the resultant breach of the warranty of fitness for a particular purpose.

62.     As a result of the failure of the four Flowserve screw pumps and cargo transfer systems integrated into the Cycler 3000 and Cycler 5500 to perform as warranted, CGBM/Accutrans have sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue.  These damages include, but are not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) purchasing and modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.

63.     Accutrans, as buyer of the four screw pumps and cargo transfer systems was at all

[16]

relevant times in privity with Flowserve so as to assert implied warranty claims against Flowserve under TEX. BUS. & COM. CODE § 2.314.

64.     In addition or in the alternative, CGBM/Accutrans are entitled to assert implied warranty claims against Flowserve even in the absence of privity under TEX. BUS. & COM. CODE §§ 2.314 and 2.318.

65.     In addition, should Flowserve seek to interpose any limitation of remedies as between itself and CGBM/Accutrans, such limitations are precluded, because such limited remedies, if any, failed of their essential purpose, and/or are unconscionable under TEX. BUS. & COM. CODE §§ 2.719(b) and 2.719(c).   Additionally, such limitation of remedies, if any, is precluded due to material misrepresentations and fraud by Flowserve under TEX. BUS. & COM. CODE § 2.721.

   **E.     Count V--Breach of Implied Warranty of Good and Workmanlike Services by Sterling and Flowserve**

66.     CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-65 as if fully set forth herein.

67.     Between February 25, 2014 and April 10, 2014, Sterling and Flowserve made numerous repair and modification attempts to the screw pumps and cargo transfer systems of the Cycler 3000 and Cycler 5500, all at increased expense to CGBM/Accutrans, but could not determine (i) why the barges' cargo transfer systems did not work or (ii) how to fix them. Instead, Sterling and Flowserve abandoned all efforts to fix, repair or rework the cargo transfer systems on April 11, 2014.   In connection with Sterling's and Flowserve's repair and modification efforts, Sterling's and Flowserve's employees and representatives failed to perform in a good and workmanlike manner, inasmuch as Sterling's and Flowserve's employees and representatives stopped looking for solutions to repair and modify the Cycler 3000 and Cycler 5500 and their screw pumps and cargo transfer systems, and instead spent their efforts looking

[17]

for support to blame each other and even to blame CGBM/Accutrans for Defendants' failure to deliver barges, screw pumps, and cargo transfer systems that worked.

68.     As of the time of the filing of this suit, one of the four screw pumps has been modified by a third-party contractor that CGBM/Accutrans had to retain for the purpose of undertaking Sterling's and Flowserve's obligations to deliver barges, screw pumps, and cargo transfer systems that met the specified requirements of the Transportation Agreement.  The one screw pump that has been repaired and modified by the third-party contractor has performed in accordance with the specified requirements of the Transportation Agreement.  It will take additional time and expense to repair and modify the remaining three screw pumps and cause the Cycler 3000 and Cycler 5500 to be in compliance with the requirements of the Sterling Contract and the Flowserve sales proposal, such that they will each be able to perform in accordance with the specified requirements of the Transportation Agreement.

69.     As a result of Sterling's and Flowserve's breach of the implied warranty of good and workmanlike services, CGBM/Accutrans have sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue.  These damages include, but are not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.

### F.     Count VI—Fraud, Fraud in the Inducement, and Fraud by Omission by Flowserve

70.     CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-69 as if fully set forth herein.

71.     Flowserve made representations to CGBM/Accutrans concerning the design,

[18]

engineering, manufacture, installation, and suitability of its screw pumps and cargo transfer systems both before and after CGBM/Accutrans discovered that the four screw pumps and cargo transfer systems integrated into the Cycler 3000 and Cycler 5500 were not capable of transferring coker feed cargo at a rate of approximately 5,000 barrels per hour.  Flowserve's representations included, but are not limited to (i) that Flowserve's existing NL screw pump design as re-engineered by Flowserve prior to delivery could meet specifications and perform at the stated flow rate for coker feed cargo of approximately 5,000 barrels per hour, (ii) that Flowserve undertook engineering, consulted outside sources, and further modified the cargo transfer systems' design to perform at the stated flow rate for coker feed cargo of approximately 5,000 barrels per hour, and (iii) that Flowserve conducted "in shop" performance testing and vibration testing of the four screw pumps that showed them capable of actually transferring 4,930 to 5,010 barrels of cargo per hour.

72.    Flowserve's representations were material to CGBM/Accutrans in their decisions to enter into the Sterling Contract for the Cycler 3000 and Cycler 5500 and the sales proposal to integrate Flowserve's screw pumps and cargo transfer systems into the barges.  Flowserve's representations were false, and when Flowserve made the representations, it did so knowingly or with reckless disregard of their truth or falsity.   Additionally, Flowserve made the representations with the intent that CGBM/Accutrans act on the representations, and to induce CGBM/Accutrans to accept Flowserve's September 19, 2012, sales proposal.   Moreover, Flowserve knew that Accutrans was basing its decision to accept the September 19, 2012, sales proposal on such representations and that if Accutrans knew that Flowserve did not possess the skills, knowledge, capabilities, and resources to design, engineer, test, and supply four screw pumps and cargo systems that would enable the Cycler 3000 and Cycler 5500 to perform at the stated flow rate for coker feed cargo of approximately 5,000 barrels per hour, then Accutrans would not have accepted Flowserve's September 19, 2012, sales proposal and would have sourced compliant screw pumps and cargo transfer systems from other vendors.

[19]

73.     CGBM/Accutrans reasonably relied on Flowserve's representations, and it did so to their detriment.   As a result of Flowserve's representations, CGBM/Accutrans sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue. These damages include, but are not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) purchasing and modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.   These damages were/are the direct and proximate result of Flowserve's representations.

74.     Flowserve concealed from and/or failed to disclose to CGBM/Accutrans certain facts concerning the design, engineering, manufacture, installation, and suitability of its screw pumps and cargo transfer systems both before and after CBGM/Accutrans discovered that the four screw pumps and cargo transfer systems integrated into the Cycler 3000 and Cycler 5500 were not capable of transferring coker feed cargo at a rate of approximately 5,000 barrels per hour.  Flowserve's omissions included, but are not limited to (i) that Flowserve's existing NL screw pump design could not meet specifications and perform at the stated flow rate for coker feed cargo of approximately 5,000 barrels per hour even with additional engineering prior to delivery to change the existing cargo transfer systems' design, (ii) that Flowserve did not conduct any actual performance testing of the four screw pumps and cargo transfer systems, and that no shop testing showed them capable of actually transferring 4,930 to 5,010 barrels of cargo per hour, and  (iii) that Flowserve did not perform any vibration testing of the four screw pumps as required in its proposal.

75.     Flowserve had a duty to disclose the foregoing facts to CGBM/Accutrans but instead remained silent, choosing instead to disclose some facts, blame Sterling, and conceal the

[20]

foregoing material information.

76. Flowserve's undisclosed facts were material to CGBM/Accutrans in their decisions to enter into the Sterling Contract for the Cycler 3000 and Cycler 5500 and the sales proposal to integrate Flowserve's screw pumps and cargo transfer systems into the barges. Flowserve knew that CGBM/Accutrans were ignorant of these undisclosed facts and that CGBM/Accutrans did not have an equal opportunity to discover the truth of those facts that were concealed. Additionally, Flowserve remained deliberately silent when it had a duty to speak with the intent to induce CGBM/Accutrans to accept Flowserve's September 19, 2012, sales proposal. That silence continued after written acceptance of the sales proposal by CGBM/Accutrans. That Silence continued after Flowserve accepted payment of $1,329,766.00. That silence continued until after the pumps were delivered, the cargo transfer systems were modified and re-designed by Flowserve and installed and launched into the navigable waters of the State of Texas. Moreover, Flowserve knew that if it disclosed this information to Accutrans/CGBM, then Accutrans/CGBM would not have accepted Flowserve's September 19, 2012, sales proposal, and a competitor would potentially gain access to its customer, CITGO.

77. CGBM/Accutrans reasonably relied on Flowserve's nondisclosure, and it did so to its detriment. As a result of Flowserve's nondisclosure, CGBM/Accutrans sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue. These damages include, but are not limited to, the costs associated with (i) chartering barges and tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) purchasing and modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems. These damages are the direct and proximate result of Flowserve's nondisclosure.

[21]

### G.      Count VII—Negligent Misrepresentation by Flowserve

78.     CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-77 as if fully set forth herein.

79.     In the course of negotiations leading to Accutrans' acceptance of Flowserve's September 19, 2012, sales proposal and thereafter, Flowserve made representations to CGBM/Accutrans including, but not limited to (i) that Flowserve's existing NL screw pump as re-designed prior to delivery could meet specifications and perform at the stated flow rate for coker feed cargo of approximately 5,000 barrels per hour with only additional engineering to change the existing cargo transfer system design, (ii) that Flowserve undertook engineering, consulted outside sources, and further modified the cargo transfer systems' design to perform at the stated flow rate for coker feed cargo of approximately 5,000 barrels per hour, and (iii) that Flowserve conducted performance testing and vibration testing of the four screw pumps and cargo transfer systems that showed them capable of actually transferring 4,930 to 5,010  barrels of cargo per hour.

80.     Flowserve's representations were material to, and supplied for the guidance of, CGBM/Accutrans in their decisions to enter into the Sterling Contract for the Cycler 3000 and Cycler 5500 and the September 19, 2012, sales proposal to integrate Flowserve's screw pumps and cargo transfer systems into the barges.  Flowserve's representations were false, and when Flowserve made the representations, it failed to exercise reasonable care to ascertain the facts upon which the representations were made and/or did so knowingly or with reckless disregard of their truth or falsity.

81.     CGBM/Accutrans reasonably relied on Flowserve's misrepresentations, and it did so to its detriment.  As a result of Flowserve's misrepresentations, CGBM/Accutrans sustained direct, incidental, and consequential damages in excess of $3,400,000 that continue to accrue. These damages include, but are not limited to, the costs associated with (i) chartering barges and

[22]

tugs from third-party competitors to cover CGBM/Accutrans' obligations under the Transportation Agreement, (ii) purchasing and modifying third-party equipment to cover CGBM/Accutrans' obligations under the Transportation Agreement, and (iii) retaining independent engineers and contractors to evaluate, fix, repair, and rework the barges' cargo transfer systems.   These damages are the direct and proximate result of Flowserve's misrepresentations.

## VI.

### ATTORNEYS' FEES

82.    CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-81 as if fully set forth herein.

83.    CGBM/Accutrans have made formal written demand on Sterling and Flowserve relating to their contractual claims and, consequently, have made adequate presentment as a precursor to recovering reasonable and necessary attorneys' fees.   Accordingly, CGBM/Accutrans sue to recover their reasonable and necessary attorneys' fees and an award of taxable and/or discretionary costs, as authorized by TEX. CIV. PRAC. & REM. CODE § 38.001, *et seq*.  In addition, CGBM/Accutrans sue to recover their reasonable and necessary attorneys' fees arising out of Sterling's and Flowserve's breach of express warranties.

## VII.

### EXEMPLARY DAMAGES

84.    CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-83 as if fully set forth herein.

85.    CGBM/Accutrans hereby plead their entitlement to recover exemplary damages from Flowserve for the harm that resulted from Flowserve's fraud and gross negligence, as

[23]

authorized by TEX. CIV. PRAC. & REM. CODE § 41.003, *et seq*.

## VIII.

### JURY DEMAND

86.     CGBM/Accutrans hereby demand a trial by jury and tender the appropriate fee contemporaneously with the filing of their Original Complaint.

## IX.

### PRAYER

87.     CGBM/Accutrans hereby adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1-86 as if fully set forth herein.

88.     WHEREFORE, PREMISES CONSIDERED, CGBM 100, LLC and Accutrans, Inc., respectfully request that Defendants, Sterling Shipyard, LP, Flowserve Corporation, and Flowserve US Inc., be cited to appear and answer herein, and that upon final hearing, CGBM 100, LLC, and Accutrans, Inc., have judgment against Sterling Shipyard, LP, Flowserve Corporation, and Flowserve US Inc., for actual damages, consequential damages, incidental damages, and exemplary damages in accordance with the evidence, together with prejudgment and post-judgment interest at the lawful legal rate, reasonable and necessary attorneys' fees, all costs of court, and for such other and further relief, either at law or in equity, general or special, to which CGBM 100, LLC, and Accutrans, Inc., may show themselves to be justly entitled.

Respectfully submitted:

**PREIS, PLC**

/s/ David M. Flotte

By: _____
    DAVID M. FLOTTE
    TBN: 00792249
    SDBN: 14337
    dflotte@preisplc.com
    601 Poydras Street, Suite 1700
    New Orleans, Louisiana 70130
    (504) 581-6062 – Telephone
    (504) 522-9129 – Facsimile

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS, CGBM 100, LLC, AND ACCUTRANS, INC.**

**OF COUNSEL:**

KEVIN T. DOSSETT
TBN: 24004623
SDBN: 22749
kdossett@preisplc.com
PREIS, PLC
Weslayan Tower
24 Greenway Plaza
Suite 2050
Houston, Texas 77046
(713) 355-6062 – Telephone
(713) 572-9129 – Facsimile

:#1743666

[25]